OPINION OF THE COURT
Daniel P. Conviser, J.
Petitioner D.S. is the subject of a sex offender civil management petition pursuant to article 10 of the Mental Hygiene Law.[1] Petitioner has moved, pursuant to CPLR 7803 (3), for an order prohibiting respondent, the Commissioner of the State Office of Mental Health (OMH), from transferring petitioner from the Central New York Psychiatric Center (CNYPC) located in Oneida County, where he is currently confined, to the Rikers Island Correctional Facility located in New York City and requiring respondent to transfer petitioner from CNYPC to the Manhattan Psychiatric Center (MPC) located in New York County. Petitioner alleges that transferring petitioner to Rikers or continuing to confine petitioner at CNYPC would be an arbitrary and capricious exercise of the discretion OMH is granted under article 10 to house offenders in secure treatment facilities. Petitioner also alleges that OMH has no authority to transfer him to Rikers subsequent to a finding (already stipulated to in this case) that there is probable cause to believe petitioner is a sex offender requiring civil management. For the reasons stated below, petitioner’s motion is denied.
Statement of Facts
D.S. was convicted by plea of guilty on June 25, 2001, in New York County, of rape in the first degree and subsequently sentenced to a determinate term of imprisonment of five years followed by a five-year period of postrelease supervision. D.S. was released from prison on June 6, 2006 and subsequently confined pursuant to article 10 of the Mental Hygiene Law at CNYPC in Oneida County. Since arriving at CNYPC, D.S. has been enrolled in a sex offender treatment program there. The underlying sex offender civil management proceeding in this case was originally venued in Oneida County, where petitioner was and continues to be located. Subsequent to being confined at CNYPC, petitioner waived his statutory right to a “probable cause hearing” under the statute and so is being held for trial.
*529 On March 13, 2008, however, over petitioner’s objection, venue was transferred from Oneida County to New York County by order of the Oneida County Supreme Court (Tormey, J.). Venue currently lies pursuant to that order in New York County. Petitioner has thus requested to be transferred from CNYPC to the one facility (MPC) operated by OMH for the confinement of sex offenders pursuant to article 10 of the Mental Hygiene Law which is in proximity to petitioner’s ongoing legal proceedings and petitioner’s counsel.
OMH currently operates three facilities which house sex offenders pursuant to article 10: CNYPC, which, as noted above, is located in Oneida County; St. Lawrence Psychiatric Center (SLP), which is located in St. Lawrence County, and MPC, located in New York County. Facilities housing persons confined under article 10 of the Mental Hygiene Law are defined in the statute as “secure treatment facilities” and are designated by the statute to provide “care and treatment to persons confined” under article 10. (Mental Hygiene Law § 10.03 [o].) A report to the Governor and the Legislature on the implementation of article 10, dated January 28, 2008, reported that CNYPC housed 125 offenders and had the capacity to house an additional 25 offenders, SLP housed 36 offenders and had the capacity to house an additional 44 offenders and MPC had a capacity of 20 offenders. The report also noted that 150 new beds were scheduled to become available at CNYPC in the summer of 2008. (See petitioner’s reply affirmation by Karen G. Andreasian, May 23, 2008, exhibit A at 8 [the Andreasian affirmation]; New York State Office of Mental Health, Report to the Governor and the Legislature Pursuant to Article 10 of the New York State Mental Hygiene Law, at 8, available at http://www.omh.state.ny.us/ omhweb/statistics/forensic/report.pdf [accessed Jan. 7, 2009], cached at http://www.nycourts.gov/reporter/webdocs/ statistics_forensic_report.pdf.) During testimony concerning the instant motion by OMH Associate Commissioner Richard P Miraglia on October 8, 2008, he indicated that the planned new 150 beds scheduled to be made available at CNYPC had not yet been completed.
The refusal to move D.S. from CNYPC to MPC, as discussed in more detail below, presents, according to petitioner’s counsel, petitioner with a “Hobson’s choice.” On the one hand, petitioner can remain at CNYPC in which case he will continue to receive sex offender treatment but be physically separated from his attorney, depriving him of the effective assistance of counsel. On *530 the other hand, OMH has offered to house petitioner at Rikers prior to and during petitioner’s trial where petitioner would be in close proximity to his attorney and to ongoing court proceedings but would not receive continued sex offender treatment.
According to petitioner, “Respondent arbitrarily and capriciously refuses to move [D.S.] to MFC, where he could continue treatment pending his trial, thus defeating the statute’s purpose of involving sex offenders in treatment programs in a manner calculated to promote their success.” (See verified petition for temporary restraining order and article 78, Apr. 25, 2008, If 12.) Petitioner alleges that only 11 offenders are currently lodged at MFC, that MFC can accommodate 20 offenders and that OMH could easily house petitioner at MFC.
Respondent makes a number of points in reply. Respondent has submitted an affidavit from an OMH Associate Commissioner, Richard E Miraglia (Miraglia off), as well as an affidavit from a psychiatrist, Elizabeth Farnum, who has worked as part of D.S.’s treatment team (Farnum off). Mr. Miraglia, as noted supra, also testified at a hearing in this matter. Respondent argues, first, that it is within OMH’s discretion under the statute to house persons detained under article 10 and awaiting trial (hereafter referred to, although not given this designation by either party, as pre-determination detainees) either in OMH secure treatment facilities or in local correctional facilities, like Rikers. OMH asserts that MFC has been used on a temporary basis to house certain pre-determination detainees but is not intended to be permanently used for that purpose because it does not have adequate security features. It is also asserted that because of MFC’s current structural characteristics, there is a risk that persons confined under article 10 at MFC might mingle with other psychiatric patients housed at the facility in violation of provisions of article 10 which prohibit such contact. (See Mental Hygiene Law § 10.10 [e].)
Mr. Miraglia testified that MFC was initially designated as a site to receive sex offender civil commitment cases in the fall of 2005 “on the quick” at a time when the administration of former New York Governor George Pataki directed OMH to find an immediate site where offenders leaving prison could be confined under article 9 of the Mental Hygiene Law. (See transcript of testimony of Richard E Miraglia, Oct. 8, 2008, at 7 [hereafter transcript].) OMH “prefers not to transfer Article 10 respondents to MFC where possible.” (Miraglia off 1i 14.) Nevertheless, MFC continues to be utilized for pre-determination de *531 tainees whose cases are venued in New York City in numbers which fluctuate. OMH has consented to a few transfers to MFC, where a short stay at Bikers “could be detrimental to their mental health.” {Id. 1i 15.) OMH intends to transfer D.S. to Bikers during the period immediately prior to and during his trial but does not believe a transfer to MFC prior to that time is appropriate. Mr. Miraglia testified that “[t]he primary reason for us to consider placement temporarily in [MFC] would be the presence of a serious co-existing mental illness, where a person would not be able to, may be adversely affected by the rigors of incarceration in a local jail.” (Transcript at 29-30.)
Mr. Miraglia also testified concerning the reasons why OMH has thus far not sited any permanent secure treatment facilities in the New York City metropolitan area. He testified that approximately 10 to 13 acres of space was necessary to site such a facility and that any such facility would need to be code compliant and have adequate security features. He testified that the St. Lawrence Psychiatric Center was a uniquely suitable location because it contained a code compliant building which was separated from other buildings on the site and cost only $10 million to $12 million to open. Similarly, CNYPC was determined to be a uniquely suitable building because it already had more than adequate security features and was only half occupied by persons with mental illness who were serving state correctional sentences.
Mr. Miraglia testified that there were no vacant sites in the New York City area which met those requirements and that renovating a building to meet such standards would cost over $100 million for a facility which would house 75 people. Mr. Miraglia testified that constructing a new facility would cost in the same range of money and would take years to complete. Mr. Miraglia also testified that OMH had reviewed whether any existing State Department of Correctional Services (DOCS) facilities might be available for that purpose and that none were thus far available. Mr. Miraglia testified that there were no “firm” plans to develop a downstate secure treatment facility but clearly implied that there were internal discussions about whether such a facility could be developed. (Transcript at 21.) He also speculated that developing a secure treatment facility in the New York City metropolitan area might engender community opposition which would make siting difficult and said the issues of siting a secure treatment facility were similar to those which arose in attempting to site a state prison. He testified that *532 “[w]hen the Department [of Correctional Services] has opened a prison, it’s been areas where the economy has not been so strong, and those are construction jobs and correctional facility jobs. So yes, it is [szc] would be easier to construct programs upstate.” (Transcript at 43.)
Mr. Miraglia said that with respect to offenders whose court proceedings occurred in New York City but were housed at CNYPC or SLR one of three alternatives was used. First, offenders could be transported back and forth for the proceeding. As an example of the costs involved in that alternative, Mr. Miraglia testified that it recently cost approximately $1,500 to transport one offender from SLP to a hearing in Brooklyn. Second, some offenders were housed at MPC. Third, in some cases, offenders were housed in local jails. Mr. Miraglia testified that “approximately 50% of the people who are referred for civil management do have their roots in New York City, in the Metropolitan area.” (Transcript at 33.) He acknowledged that having a facility in the New York City metropolitan area would be preferable if the appropriate cost, acreage and time considerations could be accommodated.
OMH further asserts that offenders confined at CNYPC are given adequate access to counsel through visits, correspondence and videoconferencing facilities (see generally Miraglia off). OMH acknowledges that the fact that there are only three secure treatment facilities in the state requires D.S. and others similarly situated, to receive treatment far away from where their cases are pending. Mr. Miraglia asserts that counsel is permitted to visit his or her client in person or by videoconference and that “the hospital allows the patients to have unmonitored conversations with their attorneys that will maintain attorney-client privilege.” (Miraglia off H 18.) Finally, counsel for D.S., an employee of Mental Hygiene Legal Service (MHLS), is expressly entitled to receive copies of D.S.’s clinical records and information pursuant to Mental Hygiene Law § 33.13 (c) (2). Other records may be obtained through the issuance of a judicial subpoena.
Dr. Farnum, one of D.S.’s treating psychiatrists, asserts that “[D.S.] would suffer no ill effects from spending a few weeks in the prison at Rikers Island.” She also asserts that “he would gain nothing by transferring to MPC.” (Farnum off 1Í 4.) Dr. Farnum asserts that D.S. has been diagnosed with pedophilia but has no “primary psychiatric diagnosis” such as psychosis, takes no psychotrophic medications and is “comparatively high *533 functioning.” (Id. 1Í 5.) Dr. Farnum emphasizes that it is important that D.S.’s treatment program be operated with consistent clinical staff who have the opportunity to develop a long-term clinical relationship with him. Were D.S. to be transferred to MFC at this juncture, Dr. Farnum argues, that vital consistency would be lost, impairing D.S.’s treatment program. Dr. Farnum alleges that D.S. has made slow progress in treatment and has refused to sign a “consent to treatment” contract, on the advice of his attorney, which would permit him to move from phase I to phase II of the treatment program’s five phases. She also asserts that his participation in treatment has been “sporadic at best” and that he falls asleep during group sessions. (Id. H 19.)
Petitioner disputes respondent’s characterizations of his progress in his sex offender treatment program, citing a number of instances noted in his medical records in which he was assessed as making good progress in his treatment program. (See generally Andreasian affirmation.) Petitioner also asserts that he suffers from insomnia for which he takes medication which causes him to fall asleep during the day.
Petitioner’s counsel asserts that she has experienced and is continuing to experience numerous significant problems with representing D.S. from a location which is approximately 240 miles from CNYPC. According to petitioner’s counsel:
“In order to meet with [D.S.] while he is at CNYPC, we are dependent on video-conferencing which requires at least ten days to two weeks notice for CNYPC to arrange. The medium generally impedes communication due to lag-time during speaking, and limits our capacity to react with immediacy to a developing situation or even to be spontaneous, thus compromising our ability to build a relationship of trust and confidence with our client. Telephone access is difficult and not private. During the week of May 4, 2008, Dorothea Constas telephoned [D.S.] every day and he returned the calls at least four times before they were able to reach each other. This happened because our client is in programming all day and his attorney is not necessarily in her office. Even when they do speak, the conversation must be limited due to the lack of privacy at CNYPC. With respect to medical records, we do not have ready access to the chart and cannot monitor our client’s progress. Nor do we have the opportunity to conduct *534 face-to-face interviews with hospital personnel. Telephone calls placed to staff on busy hospital units are not satisfactory because we cannot be assured that the conversations are private.” (Andreasian affirmation 1Í13.)
It is further alleged that D.S. does not always receive messages left for him by his counsel and that fax communications made to D.S. are read by CNYPC staff, making privileged communications impossible. D.S.’s counsel alleges that D.S.’s treatment staff do not return phone calls and that it has been difficult to access D.S.’s full medical chart. (See generally supplemental affirmation of Dorothea A. Constas, July 9, 2008.) In his testimony, Mr. Miraglia asserted that videoconferencing can be arranged at CNYPC on one days’ notice and that phone calls to clients from their attorneys could be conducted in private. Thus, there are significant factual disputes about the ability of D.S., given his current placement, to have effective communications with his attorneys.
Relevant Provisions of Article 10
In the determination of this motion it is important first to review the provisions of the chapter law which enacted the civil management statute (L 2007, ch 7 [the civil management statute]).
The statute provides that upon a finding that there is probable cause to believe a person is a sex offender requiring civil management, such a person shall “be committed to a secure treatment facility designated by the commissioner for care, treatment and control.” (Mental Hygiene Law § 10.06 [k].) A “secure treatment facility,” as partially discussed supra, is defined under the statute as a facility designated by OMH staffed with either OMH employees or employees from the Office of Mental Retardation and Developmental Disabilities “for the purposes of providing care and treatment” to persons “confined” under article 10. (Mental Hygiene Law § 10.03 [o].) The undefined term “confined” appears to contemplate that an offender at any stage of an article 10 proceeding should be housed at a secure treatment facility.
Section 26 of chapter 7 of the Laws of 2007 added Mental Hygiene Law § 7.18 (a), which provides, however, that “[t]here shall be in the office [of Mental Health] secure treatment facilities, as defined in subdivision (o) of section 10.03 of this title, as designated by the commissioner for the care and treatment of dangerous sex offenders requiring confinement, as described in *535 article ten of this title.” (Emphasis added.) The term “dangerous sex offender requiring confinement” is a defined term in the statute and refers to a person who has been found after a trial (or a plea) to be a sex offender in need of civil management and also determined by the court in the dispositional phase of a proceeding (or, again, pursuant to an agreed-upon disposition) to be an offender who requires confinement rather than strict and intensive supervision. (Mental Hygiene Law § 10.03 [e]; § 10.07 [f].) Thus, although offenders for whom probable cause has been found must be placed in secure treatment facilities under one provision of the statute, a separate statutory provision indicates that the purpose of these facilities is to provide treatment to offenders who have been found to be in need of civil management (rather than pre-determination detainees).
The statute also appears to provide that in addition to secure treatment facilities, pre-determination detainees may be housed in local jails such as Rikers. Section 24-a of the civil management statute amends section 500-a of the Correction Law which outlines the purposes for which county jails (such as Rikers) “shall be used.” The amendment adds to such uses the phrase: “For the confinement of persons during any proceedings pursuant to article ten of the mental hygiene law” (Correction Law § 500-a [¶] [emphasis added]). Thus, the statute obviously explicitly contemplates the use of county jails to confine offenders during the pendency of article 10 proceedings.
Section 43-a of chapter 7 of the Laws of 2007 further clarifies that point by amending Executive Law § 259-i (3) (a) (ii) to provide that the State shall pay counties or the City of New York the per capita daily cost, as limited by the statute “whenever a person [is] confined [in a local jail] during proceedings pursuant to article ten of the mental hygiene law.” This statute puts article 10 detainees in the same position, for purposes of reimbursement, as persons detained for parole violations and further indicates that the Legislature deliberately chose to authorize the confinement of article 10 respondents in local county jails prior to a civil management determination.
Petitioner argues that provisions of the statute which authorize the placement of persons confined under article 10 in local county jails “can only have been intended for those detained prior to a probable cause hearing” citing those provisions of the statute which require that once a probable cause hearing has been conducted, a pre-determination detainee must be placed in a secure treatment facility. (Andreasian affirmation 11 3.) The *536 statute is not completely clear on this point and the court is not aware of any legislative history which would further clarify the Legislature’s intent, but in the view of this court, the fairest reading of the statute’s provisions for local jail confinement is that those provisions are not so limited.
The primary statutory provision authorizing local jail placement uses the term “any proceedings” in describing its scope — a clear indication that the provision was not intended to be limited to proceedings prior to a probable cause determination. The scope of the provision is later referenced in the statute in the provision dealing with local jail reimbursement as simply “proceedings” again, without any apparent limitation. The local jail provision appears to have been written to provide flexibility to OMH in housing offenders during periods in which, for whatever reason, it was not practicable or appropriate to house offenders in secure treatment facilities. That is, it was apparently written to be used in precisely the manner OMH has proposed to use it in the instant case. In the court’s view, under the statute, offenders subject to a probable cause determination should be kept in secure treatment facilities but may also be kept for discrete periods where necessary in local jails during any article 10 proceedings.
Applicable CPLR Article 78 Standards
Petitioner has brought this action, as noted supra, pursuant to article 78 of the Civil Practice Law and Rules. (CPLR 7803 [3].) That article authorizes proceedings to “challenge action (or inaction) by agencies and officers of state and local government.” (Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C7801:l, at 27 [2008 ed].) Here, petitioner is proceeding pursuant to CPLR 7803 (3) which provides that the only questions which may be raised are “whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed.” Article 78 proceedings provide a statutory means to assert matters that at common law were brought under the prerogative writs of certiorari, mandamus and prohibition. (Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C7801:l.) Proceedings challenging a determination of an administrative agency as arbitrary and capricious where no judicial or quasi-judicial trial-type hearing is required by the agency are in the nature of a “mandamus to review.” *537 (See Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77 NY2d 753, 757 [1991].)
In the instant matter, there are two closely related but discrete claims. First, an error of law is alleged by petitioner, in that it is alleged that the asserted intention of OMH to transfer petitioner to Rikers violates the mandate that petitioner be placed in a secure treatment facility following a probable cause determination. (See order to show cause with temporary restraining order for article 78; Mental Hygiene Law § 10.06 [k]; § 10.03.) Where an agency interprets and implements a statutory provision which they are charged with effectuating, the agency’s construction of the statute should be upheld if it is not “irrational or unreasonable.” (Matter of Howard v Wyman, 28 NY2d 434, 438 [1971], rearg denied 29 NY2d 749 [1971].)
It is also alleged here, however, that OMH’s anticipated action (in transferring petitioner to Rikers) and inaction (refusing to transfer petitioner to MFC) is arbitrary and capricious and an abuse of discretion.[2] In Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County (34 NY2d 222, 231 [1974]), the Court of Appeals held that “[arbitrary action is without sound basis in reason and is generally taken without regard to the facts.” Moreover, “once it has been determined that an agency’s conclusion has a sound basis in reason the judicial function is at an end.” (Matter of Mankarios v New York City Taxi & Limousine Commn., 49 AD3d 316, 317 [1st Dept 2008] [citations omitted].) An article 78 reviewing court must not substitute its judgment for the judgment of an administrative agency whose actions it is reviewing unless the agency’s decision is arbitrary and capricious.
Here, it is clear that under the statute OMH is vested with the discretion to make determinations with respect to the placement of pre-determination detainees under article 10. The fact that the agency is vested with discretion, however, does not mean that such a discretionary determination is not reviewable by a court in an article 78 petition. This court retains the power to “review and annul a determination that was irrational, arbitrary, or capricious.” (Matter of Anonymous v Commissioner *538 of Health, 21 AD3d 841, 843 [1st Dept 2005] [internal quotation marks omitted].)
Courts have generally rejected arguments made by prison inmates who have brought article 78 petitions contesting the determinations of correctional officials to transfer or not transfer them to different correctional facilities, finding that the actions of prison officials rested on a rational basis and holding that inmates cannot choose which facilities they are placed in. (See Matter of Burr v Goord, 8 AD3d 853 [3d Dept 2004]; Matter of Martin v Coughlin, 207 AD2d 932 [3d Dept 1994]; Matter of Inman v Coughlin, 131 AD2d 900 [3d Dept 1987]; Matter of Gregg v Scully, 108 AD2d 748 [2d Dept 1985], lv denied 65 NY2d 601 [1985].) These cases are readily distinguishable from the instant matter, however. Here, the significant problem which would allegedly arise from the failure of OMH to transfer petitioner to MPC would be the deprivation of the effective assistance of counsel; the problem which would allegedly arise from transferring petitioner to Hikers would be the deprivation of statutorily mandated sex offender treatment. In the prisoner cases cited supra, to the extent the petitioners made substantive claims, they concerned assertions that DOCS was keeping inmates in or transferring inmates to facilities with inappropriate security classifications, claims that, even were they true, would not implicate the more significant issues being raised here.
Conclusions of Law
In its determination of this motion, the court first considered whether this petition could be determined on a summary basis based on the pleadings, papers and admissions or, alternatively, whether any triable issues of fact were raised which necessitated a trial. (See CPLR 409 [b]; 410.) There are obviously significant issues of fact which have been raised in this motion on many important issues, most significantly, those dealing with the alleged impairment of petitioner’s right to counsel. With respect to the basic question here, however — whether respondent would be making an error of law or acting in an arbitrary and capricious fashion by temporarily transferring petitioner to Hikers and failing to transfer him to MPC — in the view of this court, there is no triable issue of fact which has been raised and respondent is entitled to a summary determination. (See Matter of Frederick v Civil Serv. Commn. of County of Schenectady, 175 AD2d 428, 429 [3d Dept 1991] [“When undisputed facts are *539 found in the record which furnish a sound basis for the challenged determination, the mere presence of other factual disputes does not require a trial”].)[3]
The issues raised by petitioner here are arising with increasing frequency in article 10 proceedings and derive from a single fact — that although a large proportion of article 10 proceedings have been and will likely continue to be venued in the New York City metropolitan area, the State Office of Mental Health has thus far made a policy determination to not site any permanent facility for housing article 10 offenders in any location near the City of New York. That policy determination, in the view of this court, is causing and will continue to cause significant problems in the effective implementation of article 10.
First, it has resulted and seems likely to continue to result in significant costs to the State. Associate Commissioner Miraglia testified that it cost approximately $1,500 to transport an offender from SLP to New York City for a single hearing. The State also must pay daily costs whenever offenders are temporarily housed in local jails. To the extent state psychiatric professionals employed at CNYPC or SLP are required to testify at distant court proceedings or staff from the State Attorney General’s office or Mental Hygiene Legal Service must travel back and forth between the locations where they are based and the locations where respondents are confined, obviously, additional costs will be incurred. It seems clear that such costs will include not only food, lodging and transportation expenses but the significant lost time which will arise from having medical and legal professionals spending days on the road rather than working on article 10 proceedings.
Second, to the extent offenders will, of necessity, continue to be housed at Rikers by virtue of scheduled court appearances or counsel visits, the sex offender treatment of these offenders will be interrupted. This, in turn, in the view of this court, has the potential to impair those treatment programs. Treatment, of course, is one of the primary purposes of the civil management statute. The statute mandates comprehensive treatment programs to enhance public safety. (See Mental Hygiene Law § 10.01.) To the extent those treatment programs are interrupted, the public safety goals of the statute may be impaired.
*540 Third, the ability of respondents to have effective communication with their lawyers is being and will continue to be impaired by the failure of OMH to site a facility in the New York City metropolitan area. Article 10 proceedings implicate fundamental liberty interests. “Involuntary civil confinement ‘may entail indefinite confinement, [which] could be a more intrusive exercise of state power than incarceration following a criminal conviction.’ ” (Mental Hygiene Legal Serv. v Spitzer, 2007 WL 4115936, *6, 2007 US Dist LEXIS 85163, *21 [SD NY, Nov. 16, 2007, Lynch, J.], quoting Project Release v Prevost, 722 F2d 960, 971 [2d Cir 1983].) It is obviously difficult to provide effective legal representation to a client who is located hundreds of miles away.
Respondent characterizes the problems which have been asserted by petitioner in this motion with respect to his ability to communicate with his attorney as “mere inconveniences.” (See respondent’s supplemental mem of law in opposition to motion for restraining order, July 18, 2008, at 3.) In the court’s view, as discussed infra, while those issues do not rise to the level of depriving petitioner of the effective assistance of counsel, they are more than inconveniences. This is true, in part, because of the unique attorney-client communication needs which arise in an article 10 proceeding. Unlike criminal or most civil proceedings, which concern whether or in what manner discrete events like a drug sale, a burglary or a robbery occurred, article 10 proceedings focus on a respondent’s mental condition, that is, whether or not the respondent has a “mental abnormality” as defined under the law. (See Mental Hygiene Law § 10.07 [d].) Since an article 10 case focuses on the mental condition of the respondent, the need for effective communication in which an attorney is able to uncover the inner workings of a client’s mind may be more crucial than the communication needs which arise in an average criminal proceeding.
Attorney-client communications in an article 10 case may also be more difficult than those in an average criminal proceeding because what an attorney must uncover from a client in an article 10 matter will generally concern the client’s previous sexual offenses and current sexual predispositions — subjects which a respondent may be reluctant to fully disclose. Thus, attorneys representing respondents in article 10 proceedings face a need for extensive information about a client’s mental condition, a trial where an unfavorable outcome may result in lifetime confinement and a subject matter which may discourage open *541 attorney-client communication. Those problems would be challenging under the best of circumstances — they are obviously more difficult when one’s client is a five-hour drive away.
Finally, the failure to site a facility in the New York City metropolitan area has engendered and seems likely to continue to engender conflicts, litigation and delays in article 10 proceedings. The problems which have arisen in the instant proceeding are not unique — they mirror the difficulties which courts are increasingly facing in trying to work with a system where respondents are housed far away from the legal proceedings which concern them.
Other trial courts confronting this issue have reached varying conclusions, although this court is not aware of any case in which an application to order OMH to transfer an article 10 offender from one facility to another was asserted through an article 78 petition. In Matter of People v Davis (17 Misc 3d 1111[A], 2007 NY Slip Op 51926[U], *4 [Sup Ct, Bronx County 2007]), the court, facing circumstances similar to those existing here, ordered the respondent moved from SLP to MFC pending an upcoming trial in Bronx County because the court found that there was no “compelling reason” justifying respondent’s continued confinement at SLR The court is also aware that a number of other courts in New York City, in unreported decisions, have simply ordered OMH to move article 10 respondents to MPC. In other cases, parties have agreed to temporary confinement at Rikers or OMH has agreed to a temporary placement at MPC.
Conversely, in State of New York v Hall (16 Misc 3d 1133[A], 2007 NY Slip Op 51677[U] [Sup Ct, Dutchess County 2007]), the court denied an application to move an article 10 respondent from SLP to a facility in closer proximity to an upcoming trial in Poughkeepsie. There, the court found that “there is no provision in the statute [article 10] which would permit this Court to override the determination of the commissioner as to an appropriate secure treatment facility.” (2007 NY Slip Op 51677[U], *2.) This court strongly believes that OMH’s determination, at least thus far, to not site any permanent secure treatment facility in proximity to New York City is a problematic policy choice. But it is also the view of this court that the actions OMH has taken in this case have not resulted from an error of law or an arbitrary and capricious exercise of its discretion.
It is important to recognize, first, that on the face of the statute, OMH has the sole discretion to place article 10 offenders in *542 appropriate facilities and courts adjudicating article 10 proceedings have no statutory authority to modify those determinations. Thus, the only way in which a court would have the power to order OMH to move an article 10 respondent from one facility to another is if the standards applicable to an article 78 petition were met.
The court believes that petitioner’s claim that respondent would make an error of law by transferring petitioner to Bikers must be rejected because in the court’s view, OMH has correctly interpreted and applied the law on this question. As noted supra, the court believes that OMH would not act in violation of law were it to determine that the petitioner should be temporarily transferred to Bikers during the period of petitioner’s trial. With respect to OMH’s plan to place petitioner at Bikers, petitioner also asserts that: “[t]he Commissioner has no discretion to compel a treatment hiatus for any reason for an Art. 10 detainee who is in treatment.” (Andreasian affirmation 1Í 5.) In the court’s view, nothing in the statute supports that conclusion. Bather, the statute gives OMH broad discretion in operating treatment programs particularly where such programs concern pre-determination detainees.
Although there are disputed issues of material fact with respect to the progress the petitioner is making in his sex offender treatment program, the court also does not believe that OMH is acting arbitrarily and capriciously with respect to its clinical determination that petitioner’s treatment program would be best served by having him remain at CNYPC. Petitioner’s treatment provider has asserted, without factual contradiction, that petitioner’s treatment program would be impaired, not improved, by transferring him to MPC. In terms of petitioner’s treatment, it is clear that respondent has a sound basis in reason to support its determination that petitioner should continue to be housed at CNYPC.
Petitioner has made various disputed claims with respect to the ability of petitioner’s counsel to consult with petitioner while petitioner is confined at CNYPC and alleged that these problems deny petitioner the effective assistance of counsel. While the standards for effective assistance of counsel have not been tested in article 10 proceedings, those standards have been extensively litigated in criminal cases. It seems reasonable in this case, as urged by respondent here, to apply those same standards to this article 10 proceeding.
Where ineffective assistance of counsel claims are raised with respect to an attorney’s work at a criminal trial, a defendant *543 must demonstrate that his attorney failed to provide him with “meaningful representation” (People v Caban, 5 NY3d 143, 152 [2005]). Under the federal standard, ineffective assistance of counsel requires both that counsel’s performance must fall below “an objective standard of reasonableness” and also that there is a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” (Strickland v Washington, 466 US 668, 688, 694 [1984], reh denied 467 US 1267 [1984].) While New York law applies the first of these tests, New York case law has departed from the second “but for” Strickland prong and adopted “a rule somewhat more favorable to defendants” (People v Turner, 5 NY3d 476, 480 [2005] [citations omitted]). Under this New York rule, a defendant need not “fully satisfy” the Strickland prejudice test. Prejudice, under the New York standard, is “a significant but not indispensable element in assessing meaningful representation.” (People v Stultz, 2 NY3d 277, 284 [2004], rearg denied 3 NY3d 702 [2004].) A court must review whether counsel’s conduct deprived a defendant of a fair trial. (People v Benevento, 91 NY2d 708 [1998].)
The disputed claims made by petitioner with respect to petitioner’s ability to prepare for trial given the physical separation between petitioner and his attorneys raise significant issues. But to the extent any of petitioner’s claims in this respect are correct, there are a number of ways they could be addressed short of having this court direct the placement of petitioner at MPC.
In the period immediately prior to and during trial proceedings, as noted above, petitioner could be confined at Hikers where he would have ready access to counsel visits. While confined at CNYPC, petitioner’s counsel may either have petitioner transported to New York for counsel visits or make the trip to Oneida County to visit petitioner. All of these options are problematic in various respects. But the fact that such steps may be necessary, in the court’s view, does not mean that respondent’s actions in continuing to house petitioner at CNYPC are arbitrary and capricious or deprive petitioner of the effective assistance of counsel. To the extent there are continuing problems with notice, confidentiality or accessibility with respect to videoconferencing or telephonic communications between MHLS and its clients at CNYPC, those problems could also be resolved through a number of means without the necessity of having the court order petitioner to be placed at MPC.
*544 On the broader and more basic question here — whether the State of New York’s policy determination to thus far not site any permanent facility for housing article 10 offenders in any vicinity easily accessible to the New York City metropolitan area is arbitrary and capricious, it is clear that OMH has a sound basis in reason for the actions it has taken. The State of New York, in designing its system for confining article 10 offendérs, has carefully considered many important factors in making determinations about where to site article 10 facilities, including appropriate security features, costs and the time needed to complete the construction of such facilities. It is also obvious that OMH has considered and is continuing to review the problems with the current system which have been outlined here and is attempting to address them to the extent possible given the facilities they are operating. The State’s actions and the factors it has considered in taking those actions are clearly rational and fact-based and the State has made its determinations by using the discretion it has been granted under article 10 in a lawful manner. Given all of these facts, in the view of this court, the State’s proposed action (temporarily transferring petitioner to Hikers) and inaction (failing to transfer petitioner to MPC) do not constitute an error of law or an arbitrary and capricious exercise of discretion. Petitioner’s motion must therefore be denied.

. Petitioner D.S. is the respondent in the underlying sex offender civil management petition which has been filed in this case pursuant to article 10 of the Mental Hygiene Law (State of New York v D.S., Sup Ct, NY County, Conviser, J., index No. 30064-08). In the instant action, his status is reversed and he is the petitioner. D.S. is referred to in this decision and order as petitioner.

. It has been noted that the standard “abuse of discretion” which is juxtaposed in the statute with the term “arbitrary and capricious” “arguably is superfluous” since an arbitrary and capricious agency action will also always be an abuse of discretion. (Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C7803:l, at 11 [2008 ed].)

. While not ordering a trial in this matter, the court, as noted supra, did order a hearing at which OMH Associate Commissioner Miraglia testified and was subject to cross-examination by petitioner.